[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a foreclosure action arising from a mortgage transaction that seems to have been masterminded by the gang that couldn't shoot straight. The court's findings of fact and conclusions of law are as follows:
I. FINDINGS OF FACT
This case involves the house and family of Mary E. George. Ms. George was born on April 7, 1913. In the late 1980's, when the events now in question occurred, she was a widow in her mid-seventies with two grown children, James George and Anne McHale. (To avoid confusion, Ms. George and her two children will be referred to by their first names.) In almost biblical fashion, Anne was a devoted daughter and James was a prodigal son. Mary lived on social security and a $100 a month widow's pension and sold Avon products on the side. Her only significant asset was her house at 23 Catherine Street in Watertown. Anne lived with her family at a different address in Watertown, and James lived with his family in Wallingford in a house owned by his wife, Marie Victoria Paul George.
In 1988, James needed money to start a business. He CT Page 1055 approached his mother, and she agreed to put up her home, together with Marie's, to secure a loan in the amount of $65,000. On August 31, 1988, Mary and Marie signed a note and mortgage with The First Connecticut Small Business Investment Company (Depo. Ex. 1).[1] The mortgage was secured by two properties described in an attached Schedule A the "First Piece" was Marie's house at 745 Seventh Ridge Road in Wallingford, and the "Second Piece" was Mary's house at 23 Catherine Street in Watertown. It was understood by the mortgagors that the payments on the house would be made by James.
James used the proceeds of the note to start a new business, B B Auto Leasing, which leased automobiles to persons who did not have outstanding credit. This was a clientele with whom James could readily identify. By early 1989, he began to experience serious financial difficulties. His business lasted only a few months. In March 1989, he again decided that the most appropriate way to acquire money was to borrow it.
Perusing through the Hartford Courant, James came upon an advertisement by a Lincoln, Rhode Island organization called Equitystars. Equitystars is a name used by Century Mortgage Company, Inc. ("Century"). Century originates refinancing loans and second mortgages on residences and then sells them in the secondary market. Approximately 90% of its business comes in over the telephone.
On or about March 20, 1989, James called an Equitystars phone number and was referred to Douglas Brown, a Century loan officer. James originally asked for a loan in his name. Century did an initial home equity and credit check on James, and, a couple of hours later, rejected his application.
Later the same day, James called Brown with a new request. His mother had a house, and could a loan be obtained on that? Brown, apparently without Mary's authorization, ran a credit check on her and discovered that her credit was good. (Ex. F.)[2] This was obviously promising. Although Mary had not yet been consulted, James and Brown each had an interest in making a loan secured by her home equity — James because he needed money and Brown because he was in the business of making loans and was paid by commission. To help ensure that the loan went through, James gave Brown some cooked-up information over the telephone. (Brown, who was notably incurious, at no time talked with Mary or, for that matter, saw James; all of his information came from James CT Page 1056 over the telephone.) Mary, according to James, had a controlling interest in this business. She received from that business a gross income of $4,326 a month. The loan was to be used for a limousine and a computer system for the business and tuition money. She was 66 years old. Brown filled out a residential loan application with this information in it. (Depo. Ex. 3.) This information was false.
Now Mary had to be convinced. James brought out the heavy artillery. He told her (and Anne as well) that he was going to be arrested for income tax evasion and needed money to pay off the Internal Revenue Service to avoid jail. Although James claimed on the stand that he owed the IRS money, he admitted that his liability was civil only. His claim that he was in danger of going to jail was false. Nevertheless, it succeeded in persuading Mary to once again mortgage her house. On April 4, Mary signed an authorization for a credit check (Ex. D), and Century prepared the closing documents.
The closing took place in the office of Century's attorney, William Nathanson, in Hamden, on April 10, 1989. James drove Mary to the closing, and he, Mary and Nathanson were the only ones present. This was Mary's first and only encounter with an agent of Century. The closing documents themselves had been prepared by Century. There were well over a dozen closing documents, but only two require comment.
The Note (a copy of which is in evidence as Depo. Ex. BB) was in the principal amount of $105,000, payable to Century or its assignee. The maturity date of the note was May 1, 2004, or 15 years hence. The monthly payments were to be in the amount of $1,069.95, commencing June 1, 1989. In fact, James and Brown had negotiated a 30-year note, and the note prepared for the closing was in error.
The Mortgage (a copy of which is in evidence as Depo. Ex. 5) securing the note had two significant errors. First, it recited the note's maturity date of May 1, 2004. Second, there was a misdescription of the security. The security was stated to be a property located in Litchfield County, with the address of 23 Catherine Street, Watertown, described in Schedule A. Schedule A, however, described the Wallingford property owned by Marie. When Century prepared the mortgage, it had the previous mortgage of the First Connecticut Small Business Investment Company before it. The secretary preparing the Century mortgage placed in Schedule A CT Page 1057 the description of the Wallingford property that had secured the first mortgage but not the Watertown property owned by Mary that had also secured that mortgage.
Shortly after the closing, Century noticed that the note and mortgage signed at the closing had maturity dates 15 rather than 30 years hence. (The error on Schedule A of the mortgage was as yet undetected.) It sent Mary "corrected" documents by Federal Express for her to sign and return to the bank. These documents consisted of a new note (a copy of which is in evidence as Depo. Ex. 4) and a new mortgage (a copy of which is in evidence as Depo. Ex. X.). These new documents, which are of the utmost importance in this case, came back with signatures in the name of "Mary E. George." They were not, however signed by Mary. The court specifically finds that these signatures are forgeries.[3]
James testified that he intercepted these documents, signed his mother's name to them, and returned them to Century. Although much of James' testimony was not credible, this portion of it was credible. In addition to James' testimony, the court bases its finding on the credible testimony of Anne, who testified that the signatures in question were not those of her mother; on the deposition testimony of Mary that she did not recognize the documents and that the signatures were not hers; and upon the Court's own examination of the signatures in question. Although. unfortunately, neither side produced either a handwriting expert or the signed originals of the documents in question, numerous genuine signatures of Mary are in evidence. When the genuine signatures are compared to the ones in question, a number of unmistakable differences stand out, notably in the capital letters "M" and "G" and, most especially, in the small "rg" in "George." The Court has been as painstaking as possible in its examination, and is convinced that the signatures on the "corrected" note and mortgage are forgeries.
This is a matter of the utmost importance because Century physically assigned the new note and not the old one to the Federal Home Loan Mortgage Corporation ("FHLMC").[4] The new note (Depo. Ex. 4) contains a stamp assigning it to FHLMC, whereas the old one does not, and the testimony of the plaintiffs' witness, Patricia Amerson, is clear that it is this note that was part of FHLMC's business records. At the same time, Century assigned the old mortgage (Depo. Ex. 5) — not the new one — to FHLMC. The reasons for this do not appear in the record. The result, however, is clear. FHLMC holds a forged note and an authentically CT Page 1058 signed mortgage.
The closing documents uniformly designated Mary to be the recipient of the proceeds. However, she never received one dime of the proceeds, even for a millisecond. Although no mention was made of this at the closing, James arranged with Century to wire the proceeds directly to an account controlled by him. On April 21, 1989, Century wired the amount of $33,853.01 (the First Connecticut Small Business Investment Company mortgage had been paid off) directly to a bank account in Hartford controlled by James. (Ex. N O.) The account credited was that of James' wife, "Marie George."
James made only two timely payments on the note. On September 8, 1989, Century wrote Mary a letter (Depo. Ex. U) informing her that the August and September payments had not been made and that she was in default. When Mary brought this to the attention of James, James made the payments but also made arrangements to have further default notices sent to his home in Wallingford, where Mary did not live. James never made another payment. On November 7, 1989, Century wrote Mary at the Wallingford address that she was again in default. James did not tell Mary of this because in October, Mary had been diagnosed as having cancer.
In March 1990, Century commenced this action. It did so in spite of the fact that it had ostensibly assigned its interest to FHLMC almost a year previously. No explanation has been offered for this. On October 6, 1992 — two weeks prior to trial — Century filed a motion to substitute FHLMC as the plaintiff, alleging a complete assignment of the note and mortgage. The motion was argued in the midst of the trial. Although Century claimed no interest in the case as a plaintiff, the court was concerned about the consequences for the defendants' counterclaim against Century if the motion were granted in full. Consequently, the court allowed FHLMC to be brought in as an additional plaintiff. After the trial, Century and FHMC filed an amended complaint as co-plaintiffs. FHLMC is, however, alleged to be the sole holder of the note and mortgage, and no relief is sought on behalf of Century.
Mary died in August 1990, and Anne McHale, the executrix of her estate, has been substituted as the defendant. Anne is the sole beneficiary of her mother's will, so this case is essentially a battle between her and FHLMC. CT Page 1059
II. THE PLEADINGS
The plaintiffs, Century and FHLMC, bring their third amended complaint in three counts. The first count seeks a foreclosure of the mortgage, describing 23 Catherine Street in Watertown as the mortgaged premises. (No foreclosure is sought against the Wallingford property owned by Marie.) The second count seeks a reformation of the note and mortgage to reflect (a) a maturity date of May 1, 2019, and (b) a formal property description of Mary's Watertown property rather than Marie's Wallingford property. The third count seeks damages on the note. FHLMC, as noted, is described throughout the third amended complaint as the holder and owner of the note and mortgage.
The defendant disputes liability under each of the three counts. She specifically denies that FHLMC is the owner and holder of the note and mortgage.
The defendant has additionally asserted a counterclaim in two counts. The first count asserts that Century's conduct in this case constituted an unfair trade practice in violation of Conn. Gen. Stat. 42-110a, et seq. The second count asserts that Century violated the state and federal truth-in-lending acts. Century denies these allegations.
III. CONCLUSIONS OF LAW
The first two counts of the plaintiffs' complaint seek a foreclosure and reformation of the mortgage. These counts present extremely difficult questions because of the misdescriptions in the mortgage — errors entirely attributable to Century's negligence. These difficult questions need not be resolved, however, because the court concludes that the plaintiffs could not prevail even if the mortgage were to be reformed.
It is helpful to initially consider the third count of the complaint, which seeks damages on the note. The court has found that the signature on the note held by FHLMC (Depo. Ex. 4) is a forgery. An analysis of the consequences of this fact requires consideration of several sections of the Uniform Commercial Code ("UCC").
Conn. Gen. Stat. 42a-3-401 (1)(1991)[5] states that, "No person is liable on an instrument unless his signature appears thereon." CT Page 1060 This plainly means that Mary — and, of course, her estate — is not liable on the note held by FHLMC, because her signature does not appear thereon. (42a-3-404 contains an exception for unauthorized signatures that are later ratified, but there is no evidence of ratification of the signature here.)
A comment to 3-401 states that,"Nothing in this section is intended to prevent any liability arising apart from the instrument itself." Comment 1 to 3-401, reprinted at 19 Conn. Gen. Stat. Ann. 345 (1990). "From the outset, the [court] must . . . distinguish between an action by the party `on the instrument' and other theories of liability." James White 
Robert Summers, Uniform Commercial Code 624 (3d ed. 1988). There may, for example, be a claim of unjust enrichment made independently of any claim on a note. See Midwest Industrial Funding v. First National Bank, 973 F.2d 534, 538 (7th Cir. 1992). Count three of the complaint here, however, unambiguously seeks damages on the note.
The unusual feature of this case is the existence of two notes. In addition to the forged note, there is an authentic note signed by Mary at the closing. But FHLMC possesses only the forged note. What are the legal consequences of this situation? Under pre-UCC law, it was reasonably clear that FHLMC could bring an action on the debt anyway, for neither a written assignment nor physical delivery of an obligation were essential — see Colburn's Appeal from Probate, 74 Conn. 463, 467, 51 A. 139 (1902) — and it is clear that Century intended to assign the underlying debt to FHLMC in this case. But this, as just stated, is an action on the note rather than an action on the debt. And, at least as far as the note is concerned, in order to enforce payment in its own name under the UCC, FHLMC must first be a "holder." 42a-3-301. One cannot be either a holder in due course or a holder not in due course without first being a holder.
Is FHLMC a holder? Although the factual situation here has something of the intricacy of a Chinese puzzle, the answer is clearly "no." "Holder" is defined by 42a-1-201 as "a person who is in possession of a document of title or an instrument or a certificated investment security drawn, issued or endorsed to him or to his order or to bearer in blank." Documents of title and certificated investment securities are not involved in this case. If FHLMC is the holder of anything, it is the holder of an "instrument." For purposes of Article 3, "`[i]nstrument' means a negotiable instrument." 42a-3-102(1)(e). And in order for a CT Page 1061 transferee to become a holder of an instrument, there must be physical delivery. 42a-3-202(1). The only instrument physically delivered to FHLMC here is the forged note. As already noted, under 42a-3-401(1) no person is liable on an instrument unless his signature appears thereon. FHLMC may not, under the UCC, enforce payment on the note. Consequently, FHLMC cannot prevail on the third count of the complaint.
What about the first two counts, which seek equitable relief — foreclosure and reformation — on the mortgage? The court has found that FHLMC holds an authentically signed mortgage. (Depo. Ex. 5.) But, assuming that the assignment of the forged note does not vitiate the assignment of the mortgage, see Second National Bank v. Dyer, 121 Conn. 263, 269-70, 184 A. 386 (1936), it is not appropriate to grant the requested relief here because Century never paid the proceeds of the loan to either Mary or to a third party designated by her. The relief sought in the first two counts — foreclosure and reformation — is, as stated, equitable in nature, and Century has not acted in a way that entitles either it or its assignee[6] to equitable relief under the peculiar circumstances of this case.
Here it is clear that the proceeds of the loan were paid directly to a bank account controlled by James a few days after the closing. The closing documents signed by Mary do not mention this, and there is no evidence that this method of payment was the subject of oral comment at the closing. To the contrary, the closing documents state that the recipient of the proceeds was to be Mary George. Moreover, there is no evidence that Mary, either orally or in writing, requested that the proceeds be paid to someone else either before or after the closing.
It is clear, of course, that Mary ultimately wanted the money to go to James. There is also evidence that, when her deposition was taken on August 3, 1990, more than a year after the closing and shortly before her death, Mary was aware that the money had gone to James or his designee and had not taken any action in response. But under the circumstance of this case, this knowledge and inaction did not amount to an authorization.
This comes down to a simple human factor. There is all the difference in the world between giving money to a third person yourself and having someone else pay that person the money without your express authorization. If Mary had received the money herself, if only for a millisecond, she could have imposed a CT Page 1062 variety of legal and moral obligations on James before turning the money over to him. The same would have been true if she had been asked to give an express written or oral authorization for direct payment of the money to him. But under the circumstances of this case, the bank's method of payment deprived her of this opportunity. And it is unrealistic to think, under the circumstances here, that her inaction after the fact amounted to an authorization either. What might be expected of a large financial institution armed with squadrons of lawyers should not be expected of a 76-year old widow with limited resources, dying of cancer. Century presented her with a fait accompli, and the fact that she did not choose to spend her last dying months litigating the matter proves nothing except, perhaps, a certain vulnerability on her part. There is certainly no cause here to grant the plaintiff equitable relief.
"To discharge an obligation, payment must be made to the obligee himself or to some third person authorized to receive it." 60 Am.Jur.2d Payment 87 (1987). "One making payment to an agent has the burden of showing that the latter had express or apparent authority to receive such payment." Taylor v. Merrill Lynch, Pierce, Fenner Smith, Inc., 245 A.2d 426, 427 (D.C. 1968). No credible showing of express or apparent authority has been made here.
An unauthorized payment to a third party may unquestionably be ratified after the fact. A sophisticated party who knows of an unauthorized payment and does not complain for years after the fact may be estopped from asserting the lack of authorization in a subsequent action to collect the debt. See, e.g., McKnight v. United States, 98 U.S. 179, 186 (1879); City of Los Angeles v. Los Angeles County, 9 Cal.2d 624, 72 P.2d 138, 141 (1937). But the question in these cases is what "equity and justice require." Id. In McKnight, for example, the debtor was a government contractor, and in Los Angeles it was the City of Los Angeles. Do equity and justice require the same result with respect to Mary George that they did in the case of these sophisticated debtors? To ask the question is to answer it. For the reasons stated above, equity and justice do not require a conclusion that Mary ratified the unauthorized payment here. In fact, it is the plaintiffs who seek equitable relief in the first two counts of the complaint, and that relief should be denied.[7]
Relief is consequently denied on each of the three counts of the complaint. CT Page 1063
B. THE COUNTERCLAIM
The first count of the defendant's counterclaim alleges a violation of Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. 42-110a, et seq. ("CUTPA"). Given the court's ruling on the complaint, this counterclaim must be summarily disposed of. An action for damages under CUTPA requires that the person bringing it have suffered an "ascertainable loss of money or property." 42-110g(a). Since relief has been denied to the plaintiffs, the defendant here has not suffered such a loss.[8]
The second count of the counterclaim alleges state and federal truth-in-lending violations. The claim is that the mortgaged property was insufficiently identified in the loan disclosure statement. (Depo. Ex. K.) But both the state and federal acts require that any action under them be brought "within one year from the date of the occurrence of the violation."15 U.S.C. § 1640(e); Conn. Gen. Stat. 36-407(e). The alleged violation occurred on April 10, 1989. The counterclaim was initially filed on June 15, 1990. The second counterclaim is, consequently, barred by the statute of limitations.
IV. CONCLUSION
For the reasons stated above, relief is denied on both the complaint and the counterclaim in their entirety. No costs are awarded.
Dated at Waterbury, this 12th day of January, 1993.
JON C. BLUE, J. Judge of the Superior Court